

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-5-2004

# In Re: Diet Drugs

Precedential or Non-Precedential: Precedential

Docket No. 03-2025

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"In Re: Diet Drugs " (2004). *2004 Decisions.* Paper 179.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/179

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

Nos. 03-2025, 03-2063 and 03-2072

IN RE: DIET DRUGS
(PHENTERMINE/FENFLURAMINE/
DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION

FLEMING & ASSOCIATES, LLP,
on behalf of its clients subject to the
Sixth Amendment to the Nationwide
Class Action Settlement Agreement with
American Home Products Corporation,
Appellant in No. 03-2025

JOEL ZUCKERBERG,
Appellant in No. 03-2063

HARITON & D'ANGELO, LLP and
NAPOLI, KAISER, BERN &
ASSOCIATES, LLP, on behalf of
themselves and their clients who are
specifically identified in and/or whose
claims are affected by Pretrial Order No.
2778,
Appellants in No. 03-2072

_____

On Appeal from the United States
District Court
for the Eastern District of Pennsylvania
Civil Action No. 99-20593

MDL No. 1203
District Court Judge: The Honorable
Harvey Bartle, III

Argued on December 10, 2003

Before: AMBRO, FUENTES and
CHERTOFF, Circuit Judges

(Filed October 5, 2004)

George M. Fleming
Sylvia Davidow
Rand P. Nolen
Fleming & Associates, LLP
1330 Post Oak Blvd., Suite 3030
Houston, TX 77056

Jonathan Massey (argued)
Jonathan Massey, P.C.
3920 Northampton Street N.W.
Washington, DC 20015

Mike O'Brien
Mike O'Brien, P.C.
1330 Post Oak Blvd., Suite 2960
Houston, TX 77056

*Attorneys for Appellant*
*Fleming & Associates, LLP*

N. Albert Bacharach, Jr.
115 Northeast 6th Avenue
Gainesville, FL 32601-3416

*Attorney for Appellant*
*Joel Zuckerberg*

Paul J. Napoli
Denise A. Rubin
W. Steven Berman
Napoli, Kaiser, Bern & Associates
3500 Sunrise Highway, Suite T207
Great River, NY 11739

Mario D'Angelo
Hariton & D'Angelo
3500 Sunrise Highway, Suite T207
Great River, NY 11739

*Attorneys for Appellants*
*Napoli, Kaiser, Bern & Associates, LLP*
*and Hariton & D'Angelo, LLP*

Peter L. Zimroth
Arnold & Porter
399 Park Avenue
New York, NY 10022

Robert D. Rosenbaum (argued)
Sarah M. Brackney
Arnold & Porter
555 Twelfth Street
Washington, DC 20004

Arnold Levin
Michael D. Fishbein (argued)
Fred S. Longer
Arnold & Levin
510 Walnut Street, Suite 500
Philadelphia, PA 19106

Charles R. Parker
John Roberson
Hill & Parker
5300 Memorial Drive, Suite 700

Houston, TX 77077

*Attorneys for Appellees*
*American Home Products Corporation*
*(a.k.a Wyeth), Plaintiffs' Class and Class*
*Counsel*

---

OPINION OF THE COURT

---

FUENTES, Circuit Judge:

This appeal arises from the multi-district litigation (MDL) 1203 diet drug product liability litigation. The appeal concerns the validity of an amendment (the "Sixth Amendment") to the Nationwide Class Action Settlement Agreement (the "Settlement Agreement") executed between Appellants and American Home Products Corporation (a.k.a. "Wyeth")[1] in relation to the diet drugs litigation. The Sixth Amendment was approved by the District Court in Pretrial Order ("PTO") No. 2778. The Amendment gives claimants who would otherwise have been bound by the Settlement Agreement the right to opt out of the Agreement and proceed with tort litigation against Wyeth in the event that the fund established to pay claims under the Settlement Agreement (i.e., the "Settlement Trust") becomes insolvent. Under the Sixth

---

[1] American Home Products changed its name to Wyeth in March 2002. We use the name Wyeth.

2

Amendment, claimants' rights to sue Wyeth are subject to certain restrictions. Because of these restrictions, Appellants here argue that the District Court should not have approved the Sixth Amendment as fair, adequate and reasonable. Appellants further argue that they were deprived of due process in that they (1) did not receive adequate notice of the risk of Trust insolvency when they opted to be bound by the Settlement Agreement and (2) did not receive adequate representation.

Because we believe that the Sixth Amendment provides class members with additional rights that did not exist under the original Settlement Agreement (specifically, the right to sue Wyeth, albeit subject to certain conditions) we will affirm the District Court's approval of the Amendment as fair, adequate and reasonable. We reject the due process notice and adequate representation arguments, because those arguments relate to the original Settlement Agreement, the validity of which is not properly before this Court, and have been previously and finally heard and rejected by this Court. Accordingly, we hold the Sixth Amendment to the Settlement Agreement to be valid.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Prior to 1997, Wyeth sold two prescription drugs for the treatment of obesity, fenfluramine and dexfenfluramine, marketed as "Pondimin" and "Redux." In September 1997, the U.S. Food and Drug Administration (FDA) issued a press release reporting abnormal echocardiograms in a "higher than expected percentage of" patients taking the drugs. See Press Release, FDA, FDA Announces Withdrawal of Fenfluramine and Dexfenfluramine (Fen-Phen) (Sept. 15, 1997). Subsequent studies suggested that the drugs may have been linked to serious cardiopulmonary side effects, including heart-valve regurgitation (the reverse flow of blood through a closed valve of the heart).

After the withdrawal of the diet drugs, 18,000 individual suits and 100 class actions were filed in state and federal courts. In December 1997, the federal cases were consolidated for pretrial purposes in the Eastern District of Pennsylvania pursuant to MDL 1203. In November 1999, Wyeth entered into a Nationwide Class Action Settlement Agreement with users of the diet drugs in the United States. After conducting fairness proceedings, the District Court in the Eastern District of Pennsylvania certified a settlement class and approved the Settlement Agreement, finding it "fair, reasonable and adequate." See PTO 1415. The Settlement Agreement became final upon exhaustion of all appeals. The Settlement Agreement established the Settlement Trust to administer Wyeth's obligations to class members who agreed to participate in the Settlement.

Diet drug users who wished to opt out of the Settlement Agreement could do so by filing an "Initial Opt Out" form by March 30, 2000. Putative class members were informed of the right to opt out through

"an elaborate and extensive plan of notice," which included weeks of television, print, and internet advertising, patient notification materials provided through pharmacists and prescribing doctors, a toll-free number, and a detailed "notice package" sent to all possible class members whose names and addresses were known or who called the toll-free number. PTO 1415. Persons who timely exercised initial opt out rights were free to pursue any and all claims against Wyeth. Those who did not remained members of the class and agreed to be bound by the conditions and benefits of the Settlement Agreement. Upon approving the Settlement Agreement, the District Court entered PTO 1415, which expressly "bars and enjoins" all class members "from asserting, and/or continuing to prosecute" any settled claim against Wyeth.[2]

The Settlement Agreement contained an exception to this bar, permitting class members who met specific physical requirements (diagnosed as having a severity of heart-valve regurgitation defined as "FDA Positive") to pursue "Intermediate Opt Out" rights. These rights allowed class members to opt out of the Settlement at a date beyond the Initial Opt Out period (without Wyeth asserting statute of limitations defenses)

and to pursue claims against Wyeth subject to certain limitations. These limitations included a prohibition against "seek[ing] punitive, exemplary, or any multiple damages." App. at 85-86.

Diet drug users who currently suffer from severe heart-valve regurgitation or from moderate regurgitation with complicating features, or who have less severe heart-valve conditions that progress to the more serious levels in the fifteen years following execution of the Settlement Agreement, may claim and recover compensation under the Settlement. The amount of their recovery is determined by damage "Matrices" that assess factors such as severity and length of illness to calculate the damage award.[3] Alternatively, class members with conditions that would allow them to qualify for these "Matrix" benefits (and who fulfill other eligibility requirements set out in the Agreement) may exercise "Back-End Opt Out" rights and pursue tort claims against Wyeth, so long as they have not already made a claim for compensation under the Settlement Agreement. Once a class member discovers that his heart-valve condition is serious enough to qualify him for Matrix-level benefits, the class member must make an election as to

---

[2] PTO 1415 further provides for the settlement court to retain "continuing and exclusive jurisdiction . . . to administer, supervise, interpret and enforce the Settlement in accordance with its terms."

[3] Class members may receive payment based on one level of disease and "step up" to additional Matrix compensation if they exhibit a Matrix-level injury by year 2015 and their heart-valve conditions increase in severity to a higher level before they reach the age of 80.

which option to pursue. The Settlement Agreement specifically provides that "[a] Class Member may not exercise a Back-End Opt Out right after claiming any Matrix Compensation Benefits." App. at 575. As with the Intermediate Opt Out, class members exercising Back-End Opt Out rights will not be blocked by statute of limitations defenses, but are restricted from asserting punitive, exemplary, or multiple damages.

Thus, according to the system set out in the Settlement Agreement, any diet drug users who fail to exercise Initial, Intermediate, or Back-End Opt Out rights are bound by the terms of the Settlement Agreement and its bar against attempting to pursue any claims against Wyeth. For those who remain in the Settlement, a claim for Matrix benefits is made by submitting a three-part "Green Form" to the Settlement Trust. Wyeth funds payment of Matrix benefits through deposits into the Trust. Under the Settlement Agreement, Wyeth's funding obligation is limited to $3.75 billion, plus any increase in value of the principal of the Trust. The fact of this limit was made known to class members through the class notice. During the fairness hearing before the District Court, experts testified as to their conclusion that, after considering extensive epidemiological and demographic evidence, $3.75 billion was more than sufficient to pay all Matrix claims anticipated under the Settlement. Based on this evidence, to which none of the parties objected, the District Court found the funds sufficient to satisfy all likely claims.

However, after approval of the Settlement Agreement, the Trust was inundated with Green Form claims for Matrix benefits in a volume not anticipated by the experts who testified at the fairness hearing. As the District Court determined, a significant proportion of the filings came from a few law firms that represented large numbers of claimants. The District Court also observed that, in conducting their claims process, these firms carried out mass screening programs in which cardiologists retained by the firms "made unreasonable judgments on a broad scale" concerning the existence, history, nature, and degree of heart-valve disease claimed. PTO 2640. The claims process was further frustrated by the fact that several of the Green Forms submitted were incomplete, which made it impossible for Trust administrators to assess eligibility for the particular Matrix benefit claimed. To ameliorate the situation, the District Court ordered that all claims for Matrix benefits be subjected to audit.

Despite this effort, the risk remained that the number of claims would exhaust the Trust's available funds. Additionally, the remedy intended under the Settlement Agreement to address the problem of insufficient Matrix funds, the Back-End Opt Out, was not available to class members who had already filed claims for Matrix benefits. Therefore, in response to the potential risk of Trust insolvency, Wyeth and Class Counsel executed a proposed Sixth Amendment to the Settlement Agreement, which would

5

create a new opt out right for class members who claimed Matrix benefits by May 3, 2003, and were found medically eligible for these benefits, but would otherwise go without payment under the original Settlement Agreement in the event of funding insufficiency.[4] Under the Sixth Amendment Opt Out right, claimants may pursue a tort action but may not name any defendant other than Wyeth, may not join any other plaintiff (other than a derivative plaintiff), and may not consolidate their action with any other.[5] The Sixth Amendment Opt Out right is also subject to the same restrictions placed on the Intermediate and Back-End Opt Out in that persons exercising this opt out may not pursue punitive, exemplary, or multiple damages. In addition to the opt out provision, the Sixth Amendment also sets forth criteria for the required level of completedness of the three-part Green Form submitted for Matrix benefits.[6] By extension, this provision allows the Trust to determine whether a class member is qualified to exercise a Sixth Amendment Opt Out.

After conducting an approval hearing, the District Court issued PTO 2778, finding the Sixth Amendment fair, reasonable and adequate. However, Appellants argue that the Sixth Amendment deprives them of their full litigation rights by imposing new restrictions on their ability to pursue tort claims against Wyeth (i.e., limiting the defendants whom they may name and join, and barring consolidation of actions). Related to this argument is Appellants' claim that the class notice pertaining to the original Settlement Agreement was inadequate for not specifically informing diet drug users of the risk of Trust insolvency and that their representation was inadequate as a result of this risk of insolvency. Thus, Appellants contend that class members affected by the risk of insolvency were denied due process and should be permitted to opt out of the Settlement unconditionally.

## II. DISCUSSION

---

[4] Before the District Court's approval of the Settlement Agreement in August 2000, the Settlement Agreement had been amended five times. For convenience, we will refer to the Settlement Agreement as it stood prior to approval of the Sixth Amendment as the "original" settlement.

[5] The option is not available to class members who have already received a payment of any Matrix benefit. Instead, a residual amount of $255 million will remain in the fund to pay claims arising from progression of already compensated Matrix-level diseases.

[6] Thus, under the Sixth Amendment, a claim for Matrix benefits will be deemed filed upon the Trust's receipt of either (1) "Part I" of a Green Form signed by the class member or (2) "Part II" of a Green Form signed by a class member indicating that he accepts entitlements to Matrix benefits.

6

## A. Fairness, Adequacy and Reasonableness of the Sixth Amendment

### 1. *Additional Rights Provided by the Sixth Amendment*

Under Federal Rule of Civil Procedure 23(e)(1)(A), a "court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." Subsection (C) states that "[t]he court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." In PTO 2778, the District Court held that this standard for analyzing the fairness of a proposed settlement under Rule 23(e) should also be applied to analyze the fairness of a proposed amendment to the settlement. See Walsh v. Great Atl. & Pac. Tea Co., 726 F.2d 956, 965 (3d Cir. 1983) (A court may approve a proposed class action settlement if it is "fair, adequate, and reasonable" to class members.).[7]

Class Counsel and Wyeth argue that the Sixth Amendment provided new rights to class members that the original Settlement Agreement did not contain. They stress that, in evaluating an amendment to a class action settlement, the court should consider whether the amendment provides additional benefits and protections for the class. See, e.g., In re Sulzer Prosthesis Liab. Litig., 2002 WL 553728, at *1 (N.D. Ohio Mar. 14, 2002) (granting approval to amended settlement agreement that increased overall value of the settlement and eliminated liens on defendants' assets for the benefits of opt-outs). One purpose for which it is appropriate to approve such an amendment is adjusting for changed circumstances, particularly in light of the parties' experience in implementing the agreement. See, e.g., In re Joint E. & S. Dists. Asbestos Litig., 237 F. Supp. 2d 297, 300 (E.D.N.Y. 2002).

The new Sixth Amendment Opt Out right provides class members who claim Matrix benefits with at least some protection against the risk that their injuries would go uncompensated if the Settlement Trust becomes insolvent at some future time. As it is now, Wyeth's financial obligations to the settlement Trust are subject to a specified maximum under the Settlement Agreement. Wyeth, therefore, has no further obligation to pay otherwise eligible Matrix claimants once its $3.75 billion

---

[7] This Court has not addressed the proper standard for a District Court to review an amendment to a settlement agreement. Neither party argues, however, that the District Court applied the wrong standard.

funding contribution is exhausted.

Appellants do not argue that any provision of the Settlement Agreement obligates Wyeth beyond this amount if the Trust cannot satisfy all claims. Rather, Appellants claim that class members did not receive adequate notice under Rule 23(e) of the risk of Trust insolvency. Thus, they argue from principles of contract and equity (discussed more fully below) that any unpaid class members would not have received the full benefit of their agreement under the Settlement due to a mutual mistake of fact concerning the Trust's capacity to satisfy all potential claims. Therefore, Appellants contend that the Settlement Agreement is void and that unpaid claimants should be released from the agreement and permitted to sue Wyeth without restriction.

Even if Appellants are correct in these contract and equity arguments, the District Court found that class members would suffer no harm by approval of the Sixth Amendment. The Court explained that because Wyeth's obligation to the class is capped at $3.75 billion, the Amendment provides a new benefit by providing those Matrix claimants who would otherwise go unpaid "with a specific contractual right to pursue their compensatory claims against Wyeth" by opting out of the Settlement. App. at 10. This right was nonexistent under the original Settlement Agreement as eligible class members who filed Green Forms claiming Matrix benefits relinquished their Back-End Opt Out rights and, consequently, agreed to be bound by the Settlement. On the other hand, if

Appellants are correct that exhaustion of funds voids the Settlement Agreement and leaves them free to pursue their tort rights without restriction, "then Class Members will have lost nothing by [the District Court's] approval of the Amendment." Id.

Further, the Amendment provides that, if the Trust becomes insolvent, Wyeth has the option of paying any eligible unpaid claims (although it would have no contractual obligation to do so) or leaving them unpaid, subject to the Sixth Amendment Opt Out. This provision was intended to give Wyeth an incentive to fund such benefits voluntarily in order to avoid defending tort claims by unpaid Matrix claimants (a threat that did not exist before the Amendment). Consolidated Brief at 26. However, Appellants argue that Wyeth always had a right to voluntarily fund unpaid Matrix claims despite the Sixth Amendment and, therefore, that this provision of the Amendment conferred no additional benefit on Appellants. Appellant Brief at 25. We are not convinced by Appellants' argument here. It is true that if Wyeth chooses to pay a claim in the event of funding exhaustion, then the compensated claimant will simply have received his bargained-for benefit under the Settlement. However, Appellants cannot view this provision of the Amendment in isolation. The Amendment as a whole provides an additional benefit to claimants through its new opt out right in addition to the incentive it gives Wyeth to pay claims voluntarily. A claimant's chance of recovering damages is only strengthened

8

by the added incentive provided by the opt out and voluntary payment provisions of the Sixth Amendment combined. Thus, the Sixth Amendment provides all claimants with additional protections against being left empty-handed that did not exist under the original Settlement Agreement.

## 2. *Restrictions on the Sixth Amendment Opt Out Right*

Appellants claim that the Sixth Amendment unfairly and unreasonably restricts the opt out right that it provides. First, Appellants assert that the Sixth Amendment Opt Out strips class members of their rights to join plaintiffs and name additional defendants in any lawsuit filed against Wyeth. We are not persuaded by this argument because, as discussed above, the Sixth Amendment still provides class members with an opt out right that did not exist under the original Settlement Agreement. The restrictions imposed apply only to suits brought by class members exercising the Sixth Amendment Opt Out and, in the absence of the Amendment, these class members would have no right to bring an action at all because they relinquished this right under the Settlement Agreement when they claimed Matrix benefits. The provision of the Agreement barring class members who claim Matrix benefits from subsequently exercising a Back-End Opt Out existed before the Sixth Amendment. See Settlement Agreement § IV.D.4.b. Without the Amendment, therefore, class members would have no right to bring a

tort action against Wyeth at all if the Trust becomes insolvent.[8] The District Court did not find sufficient reason to reject the Amendment simply because the right to sue under it "comes at the price of certain restrictions and may not go so far as [Appellants] would like." App. at 11. Further, the District Court stressed that the Sixth Amendment provides more security for a Matrix claimant than the option proposed by Appellants because "[i]n the event of a funding shortfall, class members cannot be at all sure they would be able to undo the Agreement and sue Wyeth in tort." App. at 11.

Appellants also specifically challenge the reasonableness of the Sixth Amendment's restriction on joinder, arguing from principles of civil procedure that the plaintiff is "the master of his own complaint" and that restrictions on joinder deprive opt-out plaintiffs of the right to choose their jurisdiction. Appellant Brief at 26 (citing Holmes Group, Inc. v. Vornado Air Circulation Sys., 535 U.S. 826, 831 (2002)). In response, Wyeth asserts that it negotiated this restriction in

---

[8] Class members may still have a right to sue on a mistake of fact contract theory, asserted by Appellants here. However, in such a case, they would argue that the Settlement Agreement is void, which would render the Sixth Amendment irrelevant in any case and, thus, have no bearing on the issue of whether the District Court's approval of the Amendment was proper.

order to prevent fraudulent joinders by plaintiffs attempting to block Wyeth's removal of state court actions to federal court. Consolidated Brief at 31-36. Although Appellants also cite decisions of the District Court in our case encouraging the policy of joining claims and parties, Appellant Brief at 27-28, they cite no case law suggesting that it would be unreasonable for the parties to enter into a contract that imposed such a joinder restriction as a condition of a right to sue that did not exist before (as it had been specifically relinquished under the original Agreement). Consolidated Brief at 37. Again, despite the joinder restriction, the Sixth Amendment still added new rights to the Settlement Agreement without depriving class members of any preexisting rights.

**B. Class Members' Due Process Rights: Adequacy of Notice and Class Representation**

Appellants argue that Matrix claimants who would be left empty-handed if the settlement funds prove to be insufficient were deprived of their due process rights in two instances: adequacy of notice and adequacy of class representation. First, Appellants claim that class members did not receive adequate notice of their opt out rights in accordance with Rule 23(e). Under Subsection (B), "[t]he court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise." This notice must inform class members of the existence of the pending litigation and provide them with the information "needed to decide, intelligently, whether to stay in or opt out." Amchem Prods. v. Windsor, 521 U.S. 591, 628 (1997); see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985) (stating that class members must be provided with meaningful notice and an opportunity to exclude themselves from the class). Appellants argue that the District Court's finding of adequate notice in approving the Settlement was premised in part on the assumption that the Settlement funds were sufficient to pay all claims for Matrix benefits. To have been adequate, Appellants argue that the notice should have informed the class that certain members could receive no compensation if the fund becomes insolvent. Appellant Brief at 34-35. Appellants assert that, for these class members "trapped inside the settlement without their promised benefit," the Sixth Amendment's litigation restrictions amount to a deprivation of rights without notice or opportunity for a hearing. Id. at 35-36.

Appellants also argue that these class members did not receive adequate class representation, as required by Rule 23(a). Under Subsection (4), "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if . . . the representative parties will fairly and adequately protect the interests of the class." Accordingly, class members with divergent or conflicting

interests cannot be adequately represented by the same named plaintiffs and class counsel. <u>Amchem</u>, 521 U.S. at 625-26. Appellants cite <u>Stephenson v. Doe Chemical Co.</u>, a case in which the Second Circuit held that unanticipated developments, occurring even years after the settlement, may render inadequate the representation and notice afforded some class members. 273 F.3d 249, 261 (2d Cir. 2001), <u>aff'd in part, rev'd in part per curiam</u>, 539 U.S. 111 (2003). The <u>Stephenson</u> Court held that no class action orders were binding on these class members and, therefore, upheld a collateral attack on the class settlement. <u>Id.</u> at 259. The Supreme Court's <u>per curiam</u> opinion affirmed <u>Stephenson</u> on an equally divided 4-4 vote, and therefore is not binding. Still, Appellants cite it as persuasive authority here. They argue that the Sixth Amendment creates two categories of class members, each one with divergent interests: (1) those who either claimed benefits early enough to be compensated or opted out of the Settlement under the known opt out rights in the Agreement (i.e., Initial, Intermediate, or Back-End); and (2) those who claimed benefits later and are now left with the restrictive Sixth Amendment Opt Out right. Because of these divergent interests, Appellants argue that having a single class counsel for both groups of class members resulted in inadequate representation. Appellant Brief at 39.

In short, Appellants claim that they received inadequate notice that the Trust could become insolvent and received inadequate representation in light of this potential risk, despite the fact that such a situation has not materialized and was not even contemplated at the time of the Settlement. Although couched in terms of the Sixth Amendment, in reality Appellants' due process challenges take exception to the notice and adequacy of representation involved with the original Settlement Agreement, insofar as they are centered around the alleged failure to notify potential class members of the risk of insolvency of the Trust. The District Court here was faced with the question of whether a proposed <u>amendment</u> to the original Settlement Agreement was proper, and it is the Court's answer to that question that is being appealed, not the validity of the original settlement. For that reason, this appeal is not the proper vehicle to challenge the original Settlement Agreement. That Agreement resulted in a final order certifying the class and approving the settlement, which was not addressed by the District Court in this matter. <u>See</u> <u>In re Diet Drugs</u>, 282 F.3d 220, 229 (3d Cir. 2002). To present such a challenge, Appellants must seek relief either under Rule 60(b)[9] or through a

---

[9] Rule 60(b) allows parties to petition for relief from final judgments due to, among other things, "mistake, excuse, or excusable neglect," "fraud . . ., misrepresentation, or other misconduct of an adverse party," or if "the judgment is void." Fed. R. Civ. P. 60(b); <u>see, e.g.,</u> <u>Mayberry v. Maroney</u>, 558 F.2d 1159, 1163 (3d Cir. 1977) (entertaining Rule

11

collateral attack on the order approving the Settlement.[10] Moreover, this Court has already addressed the notice and adequacy of representation with respect to the original Settlement Agreement and we found the requirements of due process satisfied. See In re Diet Drugs, 282 F.3d at 230-31; see also Shutts, 472 U.S. at 811-12 (setting forth "procedural due process protection[s]" necessary in order for a class action judgment to have binding force on absent class members). Due process does not require this Court to entertain challenges to adequacy of notice and representation every time any case related to a class action judgment comes up on appeal. See Epstein v. MCA, Inc., 179 F.3d 641, 648 (9th Cir. 1999) ("Due process requires that an absent class member's right to adequate representation be protected by the adoption of the appropriate procedures by the certifying court and by the courts that review its determinations; due process does not require collateral second guessing of those determinations and that review."). If Appellants have arguments that merit a Rule 60(b) motion or a collateral attack on the validity of settlement as to certain class members, then a record must be fully developed in the district court in the first instance. Cf. H. Prang Trucking Co., Inc.

---

60(b) motion with respect to class action settlement).

[10] See, e.g., Stephenson, 273 F.3d 249 (allowing collateral attack on a class action settlement).

v. Local Union No. 469, 613 F.2d 1235, 1239 (3d Cir. 1980) (noting that "[t]he[] issues have not been briefed on appeal, and it does not appear from the record that the parties thoroughly developed these topics below" and further noting that "the trial court should have an opportunity to pass on these important questions in the first instance").

Of course, Appellants are in no way precluded from challenging the adequacy of representation with respect to the negotiation of the Sixth Amendment here. However, we reject Appellant's argument that the Sixth Amendment created two groups of class members with divergent interests. At the time that the Amendment was negotiated, the two classes Appellants identify–individuals who have already opted out or have been fully compensated and those that remain uncompensated and bound by the settlement–did not have divergent interests. For obvious reasons, the former group had no interest whatsoever in the negotiation, while the latter group's interest was to maximize the benefits available given the possibility that the Trust may become insolvent. Hence, class counsel only had one real interest in negotiating the Amendment, and, accordingly, there was no conflict.

### C. Justiciability

Appellants make the final argument that Matrix claimants who will not be paid due to funding insufficiency should be immediately released from the Settlement so that they may pursue unrestricted actions against Wyeth in the tort system.

12

The District Court held that the principles of justiciability prevented it from addressing the issue of what the consequences would be for the parties if the Settlement Trust were actually to become exhausted. The Court held that the parties had no standing to bring such a claim because they failed to allege harm that is "actual or imminent, not 'conjectural' or 'hypothetical.'" PTO 2778 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). The Court further pointed out that any future depletion of the Trust remains purely speculative at the moment, particularly since Wyeth could still decide to supplement the funds voluntarily in order to avoid further litigation. We agree that a funding shortfall is neither "actual" nor "imminent" here. This is particularly true given the measures currently undertaken by Trust administrators, such as auditing of Green Form claims, to ease the strain on the Trust. Considering these measures, and the fact that $2 billion still remains available to the Trust to satisfy Matrix benefits, depletion of the Settlement funds may never occur. We, therefore, reject Appellant's claim here as it is not fit for adjudication at this time.

### III. CONCLUSION

For the foregoing reasons, we affirm the order of the District Court as set forth in PTO 2778, approving the Sixth Amendment to the Nationwide Class Action Settlement Agreement.

13